PEIRCE H. BRERETON *vs.* BOARD OF CANVASSERS OF THE CITY OF WARWICK *et al.*

FEBRUARY 6, 1935.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

FLYNN, C. J.   This is a reargument of a petition for a writ of *certiorari* whereon the court, on December 27, 1934, rendered an opinion quashing certain records of the board of canvassers of the city of Warwick and declaring the petitioner elected to the office of mayor of said city by a plurality of seven votes over his opponent, John A. O'Brien, to whom said board previously had issued a certificate of election.

On December 31, 1934, after permission of the court had been obtained, a motion for leave to reargue the case was filed in behalf of the respondents, and was later granted.

When the reargument was held and the record of the board of canvassers of their proceedings in counting the ballots cast at the election and declaring its result was examined by us, certain pertinent facts were clearly established.   The allegations of the petitioner for the writ of *certiorari* were made in six paragraphs.   Paragraphs 1, 2 and 3 recite substantially the respective candidacies for office, and the number of votes cast and counted for each by said board.   Paragraphs 4, 5, and 6 containing the important allegations for relief are as follows:

> "FOUR:   That following said election on, to wit, November 7th and 8th, 1934, the Board of Canvassers of said Warwick met and proceeded to count the ballots cast at said election.   Said Board of Canvassers, against the protest of this petitioner, counted, to wit, numerous ballots for said respondent which were improperly marked and defective and should not have been so counted, and refused to count certain ballots for petitioner, which petitioner avers were legal votes and should have been counted for him, and if so counted in his behalf, together with other legal ballots cast for him at said election, and also together with other

ballots counted for respondent, John A. O'Brien, which were imperfect and defective, would have resulted in the election of your petitioner to said office of Mayor of the City of Warwick.

"FIVE: That said Board of Canvassers, against the protest of this petitioner, then and there declared the respondent, John A. O'Brien, duly elected to said office and said respondent now claims title to said office.

"SIX: Said disputed ballots were, in spite of protest on the part of your petitioner, not separated and marked for identification by said Board of Canvassers, but that all said ballots are now in the custody of the said Board of Canvassers, to wit, the City Clerk of said City of Warwick."

From the record and the statements and admissions of the attorneys for the petitioner made in open court, upon reargument, the following undisputed facts appear: The petitioner was the candidate of the Republican party; that party at all times, when the ballots were being counted by the board, was represented at the count by at least two duly appointed watchers. Although in most of the wards the Democratic watchers objected to and protested the counting by the board of certain ballots for the petitioner and although said ballots were marked for identification by the board and the objections and protests were noted in its record, no objection or protest by any of the Republican watchers or by the petitioner or by anyone representing him was made as to the decision of the board in counting or rejecting any ballot. While the ballots were under the control of the board, no ballot was marked for identification or was segregated by or at the request of any Republican watcher or of the petitioner or anyone representing him; nor was any request for such marking or segregation made to the board by the petitioner or any such watcher or representative. Nor was any protest or objection made by

petitioner or anybody else when the board, composed of two Republicans and one Democrat, declared by unanimous vote that John A. O'Brien was elected mayor, and issued a certificate of election to him. No claim was made before the board then nor is any made now that petitioner was prevented from a full and fair opportunity to be represented and to register objections, protests or exceptions to the count of the ballots; no fraud or lack or excess or abuse of jurisdiction was claimed before that board nor is any such claim now made by petitioner. The record of the board of canvassers entitled, "Board of Canvassers, Record 1934", and containing an admirable, complete and accurate record of the proceedings before the board at the count of the ballots, by admission of the petitioner's attorney stands unimpeached as an accurate, complete and truthful record of the proceedings of that board.

Yet, the petitioner in his petition, sworn to by him, upon which he obtained the issuance of the writ and citation in the original instance, plainly stated that, *against the protest of this petitioner*, the board counted numerous defective ballots for the respondent, John A. O'Brien, and rejected and failed to count numerous legal ballots for the petitioner and, *against the protest of this petitioner*, said board declared the respondent, John A. O'Brien, elected, and issued a certificate of election to him and, *in spite of petitioner's protest*, said board failed to separate and mark for identification said disputed ballots. None of such protests was made in fact. Moreover, in a matter of such importance to the petitioner and public, petitioner with full knowledge and notice of all material facts did not seek to protest until November 23, 1934, when for the first time he filed his petition for a writ of *certiorari* in the Supreme Court, fifteen days after the board's final decision.

After the writ of *certiorari* had been issued and citation served upon the board, and in compliance therewith the ballots had been placed by the board in the custody of the court, the sealed packages containing the ballots were

opened by direction of the court, and the attorneys for the parties were allowed to examine all the ballots and to mark for identification such of them as they respectively wished to have ruled upon by the court. Except for those marked by the board at the request of Democratic watchers, this was the first time the marking of any ballots for identification was requested or made. Five hundred fifty-four ballots were then marked.

The respondents in their brief for the original hearing contended that the court should not examine the ballots or disturb the findings or actions of the board because no objection or protest had been made by the petitioner, or by anyone representing him or acting in his behalf, to any ruling or action by the board on any ballot, and because no ballot had been marked for identification or segregated in the proceedings before the board at the request of the petitioner or anyone representing him or acting in his behalf.

Without reference to or ruling upon this contention in its opinion, the court, however, examined said 554 ballots and reached its conclusion, that no error was committed by the board in its ruling on any of the 554 ballots, with the exception of 42 ballots therein discussed, of which one for the petitioner was held to have been erroneously rejected and 11 erroneously counted for him; and that 3 for Mr. O'Brien had been erroneously rejected and 27 had been erroneously counted for him; and thereupon the court reversed the decision of the board and ordered certain corrections in the record and the certificate of election which had previously issued to Mr. O'Brien to be quashed and recalled and that a certificate of election should be issued to the petitioner.

At the reargument of the case and in their brief, the attorneys for respondents renewed their above contention. We have examined the authorities submitted bearing on this contention and have ascertained the facts to be as above stated. As a result we are convinced that the respondents' contention should be sustained.

In *Clarke* v. *Joslin*, 34 R. I. 376, (1912), which was a proceeding in *quo warranto* to determine who had been elected to certain offices in the town of Scituate, it appeared that objections had been made by the petitioners or their representatives to the board of canvassers against its decisions in rejecting certain specified ballots, the validity of which was in dispute, and that the board had overruled these objections but had not marked these ballots for identification or separated them from the others. The court held that, because none of the disputed ballots, the board's rulings on which had been objected to by the petitioner, had been marked for identification or separated so that they could be identified, the court could not in that proceeding have the sealed bundle of ballots opened and recount the ballots. At page 378 the court added the following: "By the allegations of their petition and by their testimony before us the petitioners contest the title of the respondents to the offices in question on the ground that certain ballots, about twenty-six in number, cast in favor of the petitioners were not counted, on the ground that they bore what were called distinguishing marks. Under this claim we would examine the ballots if they could be identified and presented to us; and from such inspection we would review the legality of the action of the town council in thus rejecting them. But, because it is impossible to present that evidence to us, we cannot search through the packages and select a number 'approximately twenty-six' which upon conjecture we conclude are the ballots rejected, and then inspect the marking upon the ballots so selected. Neither can we upon the allegations in this petition assume the functions of the town council and recount the whole number of votes cast at said election."

Yet, evidently because the petitioners had made their objections to the board against its rulings in rejecting certain particular ballots and the board had wrongfully failed to mark these ballots as rejected or to separate them from the others, the court permitted evidence to be intro-

duced to prove how the rejected ballots were marked and how many there were in order to put the petitioners as nearly as practicable in the same position as they would have been in if these ballots had been so marked or separated as requested. The court then reviewed the rulings of the board in rejecting ballots so marked and reversed some of the rulings and changed some of the final results reached by the board.

Consideration of the reasoning and the opinion in that case leads us to the conclusion that the court would have refused to review any of the rulings of the board or to consider changing any of the results of the election as declared by the board if the failure of the board to mark for identification or segregate the ballots was because no objection or protest had been made to the board against its ruling in counting or rejecting any ballot.

In *Adams* v. *Glen*, 53 R. I. 41, (1932), which was a proceeding by *certiorari* to review the rulings and final decision of the town council of North Providence, acting as a board of canvassers as to the election of members of the town council and the school committee, the court said at page 43: "No objection was taken by counsel for either political party to the fairness or the correctness of the counting, except to certain ballots which were marked for identification and which are the exhibits above referred to.

"The petitioners now claim that, as the counting of the ballots was coming to an end and as the result of the election appeared to be doubtful, the council in some instances became more exacting in the application of their established standard for accepting and rejecting votes, and that petitioners as a consequence suffered more than their opponents. If such is the fact, petitioners still had the right to object to any ruling on any ballot."

Clearly the court then was of the opinion that in such proceedings only ballots, the rulings on which by the board of canvassers had been objected to before the board and which therefore should have been marked by the board for

identification, should be considered by the court. Moreover, the view of the court then clearly indicates that if rulings of a board late in the counting of ballots of any election make one of the candidates wish to object to the ruling on any ballot previously counted or rejected, he still can and should make such objection and have the ballot marked for identification at any time before the counting is finally concluded and the decision made.

In *McLyman, Atty. Gen.* v. *Pontbriand,* 163 Atl. (R. I.) 882, (1933), a petition for a writ of *certiorari* and a petition in equity in the nature of *quo warranto* were filed in the Supreme Court to determine the title to certain offices in the town of Cumberland. The court said in its opinion: "Prior to the hearing of these petitions, counsel for the parties were permitted to examine the ballots cast at said election. By the stipulation of counsel filed in this court, it appears that, during the count of said ballots by the town council, at the request of the petitioners, 54 ballots were marked for identification by the clerk of the board and that they were counted or rejected by the board as stated in said stipulation. These marked ballots have been submitted to this court for a determination of the validity of the decisions made by the board with respect thereto.

"In addition to these ballots petitioners' counsel have selected from the other ballots, and presented to us for our consideration, another group of ballots which they claim are objectionable. No objection was made by petitioners to the acceptance or the rejection of these votes by the town council."

While the court found it unnecessary to rule specifically on the question now before us, it did, in fact, in that case call attention to the difference between the two kinds of ballots, those in dispute below and there marked and those disputed and marked for the first time in the court, and it examined and ruled on the former and not the latter.

For this court to determine that, although no objections or protests against rulings by the counting tribunal below

have been made to that tribunal by a petitioner and no ballots have been marked for identification or segregated in his behalf, he yet has the right to have the ballots brought to this court to be examined and marked and segregated for the first time as he chooses and then to have those ballots ruled upon by this court, would be to make the court a super-returning board for all elections for local and general state offices. It would make the court not one for the review of specified errors of law made by the ballot-counting tribunal and there pointed out and complained of to that tribunal and the evidence of which has or should have been preserved, but it would require the court virtually to make a recount *de novo*. It would enable any losing candidate before the board or body acting as a ballot-counting tribunal, without previous objections and in the absence of fraud or other sufficient abuses, to use the writ of *certiorari* to create a new record rather than to have it review a record already made and preserved for the review of errors therein.

We are convinced that such a determination is contrary to the reasoning of the court in several previous cases; that it is supported by no previous cases submitted and is contrary to the principles which govern the use of writs of *certiorari* and *quo warranto*. We therefore decide that the writ of *certiorari* in this case shall be quashed; that the original declaration by the board of canvassers that the respondent, John A. O'Brien, was elected mayor of the city of Warwick shall be affirmed and that said board shall issue a certificate of election to John A. O'Brien and recall the certificate which was issued in accordance with the previous opinion and order of the court to the petitioner, Peirce H. Brereton, and that the records of the respondent board be corrected to conform to this opinion.

As this conclusion is decisive of the case, we have made no recount of any ballots and we might end this opinion at this point. But in order to get a clear idea of the questions presented to us by the extensive treatment of ballot markings in the briefs and arguments of both parties, we have

examined and considered the opinions and rescripts of the court in previous cases and have examined and compared the disputed ballots suggested by the parties on their reargument. From this we have reached some definite conclusions which we deem it proper and advisable to state by way of *dicta*. These may be of assistance to canvassing boards or other bodies charged with counting ballots in this state. It seems to us fairer to state these conclusions now rather than to apply them for the first time in cases which may be brought before this court after some future election.

A very large number of ballots which have been called to our attention in this case are comprised of those in which the cross has been made by one line or several more or less parallel lines crossing two or more lines that are more or less parallel to each other. These crosses range by almost infinitesimal differences from those in which the so-called parallel lines are almost coincidental with each other to those where they are separated by a comparatively considerable interval; and from those in which the so-called parallel lines are closely parallel to those in which such lines differ considerably in their directions. In some of the crosses the so-called parallel lines meet at one end, in some at both ends and in some cross each other at various places. It is obvious to us that a very considerable proportion of voters intended and attempted to improve the cross originally made by making the lines heavier or by making new lines which are straighter than the first ones or which cross the other leg of the cross at a better angle. In many there is a line connecting an end of one leg of the cross with the end of the other leg and the heaviness and straightness of such connecting lines varies with very slight gradations.

A great many of the variations from perfect crosses are evidently due to the voter's imperfect eyesight, feeble or shaky hands or fingers, or from inexperience in the use of pencils or imperfect condition of pencils or other voting equipment, which the voter is obliged to use frequently under crowded or other difficult conditions. This and the

almost infinitesimal gradations and variations in these crosses convince us that these extra or surplus marks, while unnecessary, are, nevertheless, technical errors within the meaning of our statute and were not intentionally made by the voter in a way that reasonably would make the ballot bearing such marks distinguishable as the one cast by that voter. Clearly many of the ballots so marked have been rejected in times past as defective on the ground that the cross was not the type of cross required by section 45 of chapter 11 of General Laws 1923. In so far as it is pertinent to this inquiry, that section reads as follows: "If for any reason it is *impossible* to determine the voter's choice for any office to be filled, his ballot shall not be counted for such office, but it shall be counted for all offices properly marked. No ballot shall be rejected for any *technical error* which does not make it impossible to determine the voter's choice, but no voter shall place any mark upon his ballot by which it may be afterwards identified as *the one* voted by him. One line crossing another at any angle within the circle or any voting square, or at the right of any name shall be deemed a valid voting-mark."

In our opinion a careful reading of this statute as a whole, according to accepted standards of statutory construction, requires the interpretation that the legislature clearly intended that the whole section shall be construed with liberality toward the voter and that no voter's ballot shall be rejected even if it presents a technical error, provided it is not impossible to determine the voter's choice and the ballot is free from distinguishing marks.

The legislature used the word *impossible* and it should be given its ordinary meaning. The whole statute therefore seeks to protect the intent of the voter whenever it is reasonably possible of ascertainment. This paramount purpose has been frequently passed upon and recognized in language similar to that used in *Rice* v. *Durfee*, 43 R. I. 407, where the court said: "It is well settled that *the intent of the voter is controlling* if such intent can reasonably be determined from the ballot which he has cast."

In the next sentence of the statute, the legislature sets up a further safeguard to protect a voter against indiscriminate rejection of his ballot when his intent is possible of ascertainment by stating that "no ballot shall be rejected for any technical error." By using the words *technical error*, the legislature evidently took for granted that no citizen would be deprived of his vote because of any accidental or inadvertent act, perhaps unknown to the voter himself. Exclusive of the matter of distinguishing marks, the words, *technical error*, in our opinion were used deliberately to cover intentional markings which were unnecessary but which would not make it impossible to ascertain the voter's intent. A technical error is a deviation from the right course or standard in the performance of any act requiring some skill or technique. It includes an act of volition which erroneously, yet none the less intentionally, departs from a prescribed standard, but which does not go to the very substance or merits of the matter.

Having clearly expressed the mandate to boards or other bodies charged with the counting of ballots, that the intent of the voter shall control, if reasonably possible of ascertainment, and having added the further protection against rejection of ballots because of any *technical error*, the statute then, in a dependant or qualifying clause, admonishes the voter himself when it says: "but no voter shall place any mark on his ballot by which it may be afterwards identified as *the one* voted by him." This latter clause should not be read as if it were a separate provision in some other paragraph or as an independent clause or sentence but rather should be considered together with the sentence of which it is a part and together with the context of the whole paragraph, which particularly emphasizes the intent of the voter as controlling.

The statute does not say that, if the voter shall place any mark other than one cross upon the ballot, it shall be construed as or deemed to be a mark of identification. If the legislature so intended, it would have used simple and

direct language to express this thought. Moreover, it is most improbable that, although the legislature made clear its positive purpose of protecting a voter's intent and choice even if the voter committed some intentional but technical error in marking his ballot, yet in the same sentence it should seek to destroy that protection by making his ballot invalid through the presence of any marks other than a precise voting cross. Again the last sentence of the paragraph of the statute above quoted should be construed with liberality toward the voter in view of the clearly expressed intent of the legislature in the preceding portions of that paragraph. So construed, the last sentence above quoted means that if two lines are made so that they cross each other within the circle or any voting square or to the right of any name, *it is deemed to be a valid cross.* It does not follow, in our opinion, that if other lines are added in making the cross, it thereby becomes invalid, unless such lines come within the scope and terms of the statute relating to distinguishing marks which would compel the rejection of the ballot on that distinct ground. In our opinion the presumption should be in favor and not against the validity of the ballot and should yield only when the circumstances indicate clearly either that the extra marking was placed upon the ballot with corrupt intent or that the marking in question is of such distinctive character in form or design as to clearly import the intent of the voter to thereby identify the ballot as the one he had cast. The burden should be upon those who attack the validity of the ballot on any grounds to sustain their charge.

Because of the considerations above discussed, it is our conclusion that the whole doctrine by which otherwise valid crosses are held to be invalidated by extra lines should be abandoned, leaving only, as to extra lines, the doctrine that they may constitute such distinguishing marks as will invalidate the ballot. Moreover, the doctrine of distinguishing marks should be very substantially limited in its application and applied only where the extra marking

is such as to identify the ballot in question as *the one* cast by a particular voter and where the only reasonable explanation of its existence is that it was intentionally placed upon the ballot by the voter with the knowledge or intent that it would so distinguish the ballot which he had cast.

There is another class of ballots to which the above reasoning applies. They comprise ballots where the voter makes no mark in a circle but marks a cross in the voting square for an individual candidate or to the right of the candidate's name and draws a line substantially through the name of the opposing candidate. Heretofore such ballots have been held defective. This cancellation seems to us to confirm the voter's intent rather than to confuse it and the line of cancellation through the opposing candidate's name, while unnecessary, is a *technical error* and is not usually in the form of or reasonably to be construed as an identifying mark.

Concerning another class of ballots, we are also impressed with the reasoning and language of Chief Justice Sweetland in the case of *Keenan* v. *Briden*, 45 R. I. 119, (1922). There, in urging the abandonment of the rule previously laid down in the case of *Gainer* v. *Dunn*, 29 R. I. 239, he said in the opinion of the court at page 129: "Over the objections of the petitioner the 53 ballots constituting group 'U' were counted in favor of the republican candidate. All of these ballots are of the following character. The voter placed a cross in the circle over the republican column and then in the column at the right of the ballot wrote the name of the petitioner in the blank space under the designation of the office of mayor, but did not draw a line through the name of Mr. Holt." He then quoted practically all of the section of the law then in effect, which was the same as the present section 42, chapter 11, General Laws, and then added: "The voters whose ballots are included in this group failed to make effectual that which was probably their purpose, *i. e.*, to vote for the petitioner, for each neglected to comply with the plain statutory requirement; but the contention

that their votes should therefore be counted for Mr. Holt presents an entirely different question. The respondents contend that they were justified in counting these ballots for Mr. Holt by reason of the concluding sentence of the section: 'When a voter has placed a cross (X) in any one circle, and has not made any mark in any other circle, such cross (X) shall be counted as a vote for each of the candidates in the column above which it is placed, except for those candidates whose names have been cancelled.' It is the opinion of the writer, and in this Mr. Justice VINCENT concurs, that this provision like all other statutory provisions should receive a reasonable construction. It was not the intention of the general assembly in such a case as that before us, when a voter marks a cross in the republican circle and does not cross out the name of Mr. Holt that such ballot should be counted for Mr. Holt, without regard to any other action of the voter or indication of his intention appearing elsewhere on the ballot. Notwithstanding the unqualified language of the sentence quoted such ballot would be affected by the provisions of Section 46, that if for any reason it is impossible to determine the voter's choice for any office to be filled his ballot shall not be counted for such office, and further that no voter shall place a mark upon his ballot by which it can later be identified as the one voted by him. In the circumstances surrounding this election it may well be found that in writing the name of Mr. Keenan in the column at the left under the designation of mayor the voter intended to vote for the petitioner for that office. Although he has failed to make that purpose effectual, to count the vote for Mr. Holt would violate a fundamental constitutional principle that the vote of an elector intended for one candidate should not be counted in favor of his opponent. Again, if under the terms of the statute the voter is held to have intended to vote for Mr. Holt, he has also by writing in the left-hand column as clearly at least indicated an intention to vote for Mr. Keenan. His ballot therefore shows an intention to

vote for two candidates for the office of mayor. By the provisions of Section 46, as it is impossible to determine the voter's choice, his ballot shall not be counted for such office."

At page 132, concluding his treatment of this question, he said: "It is sought to uphold the action of the respondents upon the authority of *Gainer* v. *Dunn*, 29 R. I. 243. It should be said of that case that it was an early decision of the court relating to the Australian ballot law. It is generally recognized that the early decision of the courts generally were marked by strict and sometimes a blind following of the literal provisions of the law without a consideration of its provisions as a whole. There appears in all jurisdictions a greater liberality in the decisions and a departure from the harshness of the earlier cases. That is true of the progress of judicial opinion in this state; and *Gainer* v. *Dunn*, *supra*, in so far as it leads to the extremely unreasonable and unconstitutional result of making a vote probably intended to be cast for one candidate count in favor of his opponent, should no longer be followed. The opinion of the majority, however, is that it is not desirable to disregard the authority of *Gainer* v. *Dunn*, *supra*, and that all of the ballots in this group, 53 in number, were properly counted for Mr. Holt." In our judgment the reasoning of Mr. Justice SWEETLAND in this regard is clearly correct and should be followed.

We feel that the general subject-matter is well treated in Wigmore, The Australian Ballot System, (2nd ed.) 193, wherein it is stated: "Whenever our statutes do not expressly declare that particular informalities avoid the ballot, it would seem best to consider their requirements as directory only. The whole purpose of the ballot as an institution is to obtain a correct expression of intention; and if, in a given case, the intention is clear, it is an entire misconception of the purpose of the requirements to treat them as essentials, that is, as objects in themselves, and not merely as means."

The said author, at page 194, after citing the opinion of Mr. Justice ALLEYN in *Dionne* v. *Gagnon*, 9 Queb. L. R. 20, says: "According to a second and sounder view, the ballot must itself furnish clear evidence of an improper agreement, such as the voter's initials, or a mark known to be his, in order that it may be rejected."

Consonant with the above expression, which we believe to be in line with the trend of liberal construction of similar statutes in this country, and applying our construction to our own statute within the language which we have found clearly expresses the legislature's intent, we are of the opinion that a more uniform standard for allowing and rejecting ballots will be possible in the future for these particular types of ballots.

There may be individual occasions and ballots which present particular problems which we have not discussed here. It is our opinion, however, that a great majority of the ballots heretofore rejected as defective by boards of canvassers and other bodies performing the functions of boards of canvassers will be saved and counted if counting tribunals will construe the voting statute as a whole, will give full effect to the intent of the voter wherever reasonably possible and will apply the rule concerning technical errors, not treated in any of the Rhode Island cases submitted to or discovered by us, but which is clearly expressed in the statute.

*Clifford A. Kingsley, Sigmund W. Fischer, Russell H. Hawkins*, for petitioner.

*Patrick H. Quinn, Joseph W. Grimes*, for respondents.